**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

Civil No: 01-2331 JNE/JSM

Anthony C. Reno and Kimberly
Reno,

Plaintiffs,

**AMENDED COMPLAINT**
(Jury Trial Requested)

v.

Supportkids, Inc., a Texas corporation;
Child Support Enforcement, Inc.,
a Texas corporation; and Richard C. Fry,

Defendants.

---

Plaintiffs, Anthony C. Reno and Kimberly Reno, for their Amended Complaint against Defendants, Supportkids, Inc., a Texas corporation; Child Support Enforcement, Inc., a Texas corporation; and Richard C. Fry (collectively "Defendants" ), state and allege as follows:

## INTRODUCTION

1. This action arises out of Defendants' attempts to extort and defraud over $122,000.00 from Plaintiffs.

## JURISDICTION

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332.

3. Plaintiffs' state law claims are predicated on the Court's diversity jurisdiction.

4. Plaintiffs seek damages, exclusive of costs and disbursements, in an amount in excess of $75,000.

**VENUE**

5. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 (a) as a substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district.

6. Defendants, at all times material hereto, were engaged in the business of debt collection in the State of Minnesota.

**PARTIES**

7. Plaintiff, Anthony C. Reno ("Mr. Reno") is a citizen of the State of Minnesota residing at 2114 Branch Avenue, Anoka, Minnesota.

8. Plaintiff, Kimberly Reno ("Mrs. Reno"), is a citizen of the State of Minnesota residing at 2114 Branch Avenue, Anoka, Minnesota.

9. Plaintiff, Anthony and Kimberly Reno (collectively the "Renos"), are husband and wife**..**

10. Defendant, Child Support Enforcement, Inc., a Texas corporation ("CSE"), is a corporation organized under the laws of the State of Texas with its principal place of business in Austin, Texas.

11. Upon information and belief, the Texas Secretary of State has revoked CSE's corporate status for CSE's failure to pay Texas franchise taxes.

12. Defendant, Supportkids, Inc. ("Supportkids"), a Texas corporation, is a corporation organized under the laws of the State of Texas; its principal place of business is in Austin, Texas; Defendant Supportkids is also known as "CSE Child Enforcement" but such name is not officially registered as an assumed name with the Texas Secretary of State.

14. Defendant, Richard C. Fry ("Defendant Fry"), is a citizen and resident of the State of Texas.

15. Defendant Fry is, upon information and belief, an attorney licensed to practice law in the State of Texas.

16. At all times material hereto, Defendants were acting jointly or otherwise acting in concert and/or aiding and abetting each other in their efforts to obtain more than $122,000 from the Renos.

## SUMMARY

17. The Renos, in this action, are asserting claims related to following Conduct: A) Defendants knowingly inflated a debt and lien from 900% to 4000% in order to extort and defraud the Renos; B) Defendants filed a illegal $122,474.07 lien on the Renos' homestead and in so doing egregiously violated multiple Minnesota laws; C) Defendants illegally charged compound interest; D) Defendants illegally charged a rate of interest significantly higher than allowed by applicable law; E); Defendants engaged in a campaign of harassment, abuse, and intimidation to "break" the Renos, and in so doing they made multiple fraudulent statements; F) Defendants knew that the debt in question was barred by the statute of limitations; and G) Defendants knowingly placed a lien on exempt homestead property; and H) Defendants knew the cause of action for past support was extinguished in 1992 under Louisiana law.

## STATEMENT OF FACTS

### A. Supportkids' Extreme Debt Collection Practices

18. Supportkids commonly uses and continues to use the name Child Support Enforcement and/or CSE in communications with non-custodial parents, employers, the families of obligors, and

19. Supportkids, as a matter of policy, Supportkids does not verify the validity of court orders; Supportkids conduct has caused a virtual tsunami of complaints and litigation against them from across the country.

20. In other words, if Supportkids knows an order was invalid or no longer in force (which was often the case), its collectors act as it were valid and in force and place liens and garnishments based on the invalid order or judgment.

21. Supportkids' management and supervisors tell their collectors that there is

no statute of limitations on collecting child support in any state. If there is a statute of limitations, it would be printed on the order or judgment itself.

22. In practice, Supportkids' policy is to completely ignore any attention to statute of limitations issues.

23. At Supportkids, it was company policy and practice to ruthlessly harass and abuse non-custodial parents.

24. Supportkids' employees threaten to charge people with felonies, to ruin people, and to kick their families out of their homes.

25. It was also Supportkids' policy and practice to have Supportkids' employees use tactics of shame and humiliation to make people crumble.

26. To that end, Supportkids calls people's employers, neighbors, relatives, spouses, grandparents, and even their churches.

27. Supportkids would especially focus on people with limited education or people with disabilities, who they saw as weak targets.

28. Supportkids as a matter of company policy inflicted intense emotional distress on people to make them crack —even though it was questionable that the people owed all the money they claimed; virtually nothing was off limits as far as threats and abuse went.

29. Further, Supportkids would file liens and send out garnishments on an assembly-line basis with no real review of the validity of the amount claimed or whether there was a valid order or judgment in place.

30. At Supportkids, employees and supervisors would knowingly make statements to non-custodial parents that were materially false and misleading; for example, they would go after people without any valid court order or after the statute of limitations had expired. They would grossly inflate back child support amounts, they would represent themselves as being from the Texas Attorney General's Office, and they would threaten to kick families out of their homes even though their property was exempt.

31. The amounts claimed in back child support were routinely inflated; Supportkids would add enormous sums when the underlying claims were only several thousand dollars in past support.

32. Supportkids has a quota of liens and garnishments that had to go out each day; if a collector did not meet quota for liens and/or garnishments, he or she had to explain the failure to a supervisor the next day.

33. Supportkids' liens and garnishments were rubber stamped by the legal department, which would merely sign the documents and send them out.

34. There was no effort to determine if a property on which they were putting liens was exempt under state law.

36. In addition, Supportkids is aware of all interest rates in all fifty states for child support as well as what states do not automatically charge interest.

37. Defendant Fry, at all times material hereto, was an employee, agent and/or a partner of Defendants CSE and Supportkids.

**B. Plaintiff Anthony Reno's Marriage and Divorce**

38. Reno married the former Sonia Besson (now Sonia Falcon) ("Sonia Falcon") in 1975.

39. The marriage lasted until 1981. They had a daughter together, Summe who was born in 1978.

40. The parties began divorce proceedings in 1980. The court, in a temporary order dated May 2, 1980, awarded Sonia Falcon $60.00 a week in child support.

41. The order stated that the parties be "separated from bed and board." Judgment *Besson Reno v. Reno*, Court File No. 80-4235 Division G, Civil District Court, Parish of Orleans, State of Louisiana), that order was converted to a judgment on May 2, 1980.

42. A final judgment of *divorce a viacule matrimonii* was signed by the Hon. Melvyn

J. Perez and filed and entered by the clerk of court; under the judgment, Mr. Reno was ordered to pay $45.00 a week in child support. *Besson Reno v. Reno* Case File No. 38-60 (34th Judicial Court, Div. C, Parish of St. Bernard, Louisiana);

43. Thereafter, Mr. Reno was required to pay on-going payments of $45.00 rather than the initial $60.00 a week.

44. For the most part, Mr. Reno regularly paid this child support.

45. However, on one occasion in the in the early 1980's, he got behind in these payments. As a result, Mr. Reno had to spend one night in jail.

46. After paying his back arrearages, Mr. Reno was released.

47. Mr. Reno, having learned his lesson, never got in any more trouble for not paying child support.

48. For a few years, Mr. Reno paid monies or had his sister Debbie Reno take his payments to the court in New Orleans.

49. After several years of these regular payments, Mr. Reno either delivered his cash payment directly to Ms. Falcon or had his sister deliver it to her. (A.

50. Ms. Falcon was receiving public assistance from the State of Louisiana at this time.

51. Ms. Falcon, however, apparently did not inform the Louisiana authorities of her cash payments.

52. In 1986, the New Orleans District Attorney, who was handling Ms. Falcons's case, listed Mr. Reno's back child support at $13,598.25. That office however, had not credited any of the regular cash payments that Mr. Reno had made.

53. In 1987 Ms. Falcon married Robert Falcon; Robert Falcon ("Mr. Falcon") then adopted Summer Reno.

54. The adoption was finalized under a decree dated October 20, 1987, by a Louisiana court.

55. Under Louisiana law, Mr. Falcon is treated as if he were her natural father to same extent as if he had been Summer's father from birth.

56. Mr. Reno had no further accruing support obligations after the 1987 adoption.

57. Mr. Reno reluctantly approved of the adoption.

58. It was Mr. Reno's understanding that in return for agreeing to the adoption and foregoing and waiving his parental rights, Ms. Falcon would not seek to recover any back child support that he may have owed.

59. At the time of the adoption, Reno estimates that he was behind in support by between $3,000 to $4,000.

60. In 1988, the New Orleans District Attorney's office made a motion get a court order directing Mr. Reno to pay past due payments; however, Ms. Falcon did not show up at the hearing and the Court dismissed the motion in a judgment entered on July 27, 1988. *State v. Reno* Case File No. 188-563A, Orleans Parish, Louisiana, Juvenile Court.

61. Because Ms. Falcon's case was dismissed, any further claims against Mr. Reno were barred *by res judicata*.

62. Ms. Falcon, between 1987 and 1999, made no further efforts to seek payment for an amount that she believed he owed her.

Although Mr. Reno had agreed to Summer's adoption, he still kept in close contact with her over the years. The two visited each other on occasion and exchanged gifts; Summer is now in her early twenties.

## C. The Adoption of Summer by Robert Falcon Foreclosed Any Prospective Child Support Obligations of Mr. Reno.

63. Ms. Falcon subsequently married one Robert Falcon.

64. Robert Falcon adopted, Summer Reno, the natural daughter of Plaintiff Anthony Reno and Ms. Falcon in an action entitled <u>In Re: Robert Falcon Applying for Adoption</u> Court File No. 853-J in the in Thirty-Fourth Judicial District Court, Division A, for the Parish of St. Bernard in the State of Louisiana.

65. The adoption was finalized pursuant to a Final Decree dated October 20, 1987, which was filed in said court ( The "Final Decree of Adoption").

66. The Final Decree of Adoption provided that "the child known to petitioners as Summer Christine Reno, forever be for all legal intents and purposes, the child of petitioners, Robert Falcon, to the same extent as if the child had been born of petitioner's marriages to his wife . . ." (Sonia Falcon).

67. The Final Decree of Adoption made, as a matter of law, Robert Falcon the father of Summer Reno.

68. Any prospective child support obligations arising under the 1981 Judgment of Divorce, after October 20, 1987, were null and void, having no force and effect based on the Final Decree of Adoption under the laws of the State of Louisiana.

**D. Mr. Reno Moves to Minnesota and Remarries.**

69. Mr. Reno subsequently moved to the State of Minnesota where he met Plaintiff, Kimberly Reno.

70. Plaintiff Reno is engaged in the sheet rock industry and he is a man of modest means and very little formal education.

71. The Renos own a home in Anoka County, Minnesota where they live with their four year child.

72. Mr. Reno filed for Bankruptcy in 1996 under Chapter 7 of the Bankruptcy Code, <u>In re Anthony Chris Reno</u> Case No. 96-44090 (Chap. 7)(Bankr. D. Minn. 1996), and all his debts were discharged on October 8, 1996, unless specifically exempted or disallowed; his case was closed on October 29, 1996.

**E. Supportkids Claims that Mr. Reno Owes Child Support**

73. In 1999, Sonia Falcon filled out an application for Supportkids' services.

74. Sonia Falcon indicated that she heard of Supportkids through a television

commercial she saw on the Lifetime Cable channel.

75. Ms. Falcon, in the application, claimed that Mr. Reno owed her $13,589.25.

76. On May 12, 1999, Sonia Falcon executed a sweeping power of attorney authorizing Supportkids to act as her attorney in fact in all matters related to her claims against Mr. Reno.

77. On September 27, 1999, Sonia Falcon filed a sworn Affidavit to Dismiss with the Orleans Parish Court wherein she stated that “she does not wish to pursue any arrears which might be owed her on this case and hereby dismisses any arrears owed.

31. Just two days after executing the Affidavit of Dismissal, on September 29, 1999, Supportkids contacted Ms. Reno and she informed one its collectors that Mr. Reno was unable to read and the child in question was adopted.

78. In 1997, for the first time, an agent for Defendants, CSE and Supportkids, called Mrs. Reno and represented to her that Mr. Reno owned back child support payments.

79. Most of the communications between the Renos and Supportkids were through Supportkids Enforcement Specialist Alice Black.

80. Alice Black, whose real name may be Alicia, who was a Supportkids’ supervisor.

81. Mrs. Reno told Supportkids that the child upon which the alleged child support payments related was adopted by Falcon’s former husband (Robert Falcon and Sonia Falcon divorced prior to 1999.

82. Mrs. Reno stated that based on the adoption, Robert Falcon, not Mr. Reno was responsible for supporting Summer Reno.

83. Supportkids represented that they would look into the issues raised by Ms. Reno, namely the effect of the adoption, and check to see if the past child support payments were valid debts.

**F. Supportkids Threatens Mr. Reno With Jail, Garnishment And Foreclosure, As Part of An Attempt To Defraud The Renos Out of $120,000.**

84. Supportkids called Mrs. Reno several days later and informed her that the approximate $120,000 claim was a valid debt and Mr. Reno better pay it; otherwise, he would to go jail and be charged with a felony, and the State of Minnesota would pull his driver's license (which due to the nature of Mr. Reno's work as a construction laborer would be catastrophic for his ability to make a living).

85. Upon information and belief, Supportkids verified that Summer Reno had been adopted and that Mr. Reno had no continuing obligations to pay child support arising after the date of the adoption; notwithstanding Supportkids's knowledge, Supportkids kept up its efforts to collect a debt they knew was not owed.

86. Mrs. Reno told Supportkids to cease harassing the Reno family through its incessant phone calls and threats.

87. Supportkids ignored Mrs. Reno's request and they kept calling and kept up their threats.

88. Mrs. Reno called Louisiana authorities and the State of Texas's Child Support Division.

89. Both the States of Louisiana and Texas showed that they had no record of any child support obligation owed by Mr. Reno.

90. Mrs. Reno informed Supporkids that the States of Texas and Louisiana showed that Mr. Reno did not owe any child support.

91. Supportkids ignored the information provided by Mrs. Reno.

92. Supportkids ignored Ms. Reno's admonition to cease calling.

93. Supportkids engaged in a pattern and practice of threatening and extorting the Renos through statements made over the telephone.

94. Supportkids, on numerous occasions used and caused to be used wire communications in interstate commerce, by both making and causing to be made wire

communications via the telephone in addition to communications sent through the mails.

95. Supportkids repeatedly told Mrs. Reno through, wire communications, that Mr. Reno was going to be jailed and that his driver's license would be revoked if he did not pay Supportkids the approximately $122,000.

96. In addition, Supportkids, through wire communications, threatened to take the Reno's home in satisfaction of the $122,000.

97. In or around Christmas of 1999, the Renos received written communications sent by Supportkids through the mails telling them to pay off the $122,000 amount; on several occasions the Renos would get letters through the mail where the amount of the alleged debt went up.

98. Supportkids demanded that Mr. Reno put out a loan on his business to pay for the alleged back child support.

98. Mr. Reno responded that Supporkids's demand was impossible and that he was a man of modest means and he lived pay check to pay check.

99. Supporkids, in response, said they would garnish Mr. Reno's paychecks and Supportkids threatened to put a lien on Reno's home.

100. Supportkids continued its campaign of harassment and threats against the Renos.

101. The Renos told Supporkids that Mr. Reno was not a deadbeat as Supportkids had claimed and that he did not owe child support.

102. Mr. Reno told Supportkids that he would again confer with Louisiana authorities regarding child support, and he if legitimately owed back child support he would pay it, but if any such money was owed it was far far less than $120,000.

103. Supportkids ignored this statement and demanded that Reno to pay the entire $122,000.

104. Supportkids stated they would garnish Mr. Reno's wages and bank

account until they got their $120,000.

105. Supportkids then, in an attempt to extort and defraud the Renos, stated that they would put a lien on the Reno's home so they could not sell it or obtain financing on it.

106. Supporkids would then threaten to foreclose and force the Renos and their young daughter on to the street in order to obtain their $120,000.

**G. An Unsatisfied Judgment, If Any Existed, Relating to Mr. Reno, Was Absolutely Barred by the Ten-Year Statute of Limitation which Expired At the Latest In 1992.**

107. Ms. Reno was informed by Louisiana authorities that there was a ten year statute of limitations in collecting judgments, including child support judgments.

108. The State of Louisiana said that amounts owing after ten years of a judgment were invalid.

109. Defendants knew that the ten-year statute of limitation for the collection of judgments expired in 1992, and that no action to renew the judgment had been commenced.

**H. Defendants File An Illegal Lien In An Effort to Extort and Defraud the Renos.**

110. In April 25, 2001, Defendants caused a illegal lien to be filed with the Anoka County Recorder's Office, Document Number 1497198, on the Renos' home as in the amount of $122,474.07 ( the "Lien") as a part of a scheme and artifice to defraud and extort the Renos.

111. Defendants causing the Lien to be filed or other wise directed its filing or aided and abetted the Lien's filing, knowingly and willfully failing to comply with the Uniform Enforcement of Foreign Judgments Act, Minn. Stat. § 548.27-28 as they failed to file a Louisiana judgment with the Court Administrator for the Tenth Judicial District in Anoka County as well as by failing to comply with said statute's other requirements and Defendants, therefore, had no right to the file the Lien; Supportkids also failed to follow the requirements of Minn. Stat. § 548.091 (Uniform Family Support Act); Defendants further illegally filed the Lien in violation of Minn. Stat. § 548.091 because the judgment in question was more than ten years old, the Lien was not filed or docketed with the Tenth Judicial District Court Administrator, and Mr. Reno was

not served with the Lien filings.; moreover, Supportkids, by failing to comply with Minnesota law, violated 42 U.S.C. § 666(a)(4) as such statute and regulation promulgated thereunder

112. Defendants knew that there was no valid judgment or order which could be domesticated in the State of Minnesota against Mr. Reno related to the purported debt; Defendants knew that the Reno's home was homestead property and their home was listed as homestead property with Anoka County.

113. Assuming *arguendo* the alleged debt was valid, the Defendants knew the Reno home was exempt from collection efforts under Minn. Stat. §§ 510.01 and 510.04 and under Art. I § 12 of the Minnesota Constitution of 1857 as amended.

114. The Renos had several opportunities to sell their home; all were prevented and/or hindered by CSE's fraudulent Lien.

115. The Renos repeatedly communicated to CSE that Mr. Reno owed no child support and that their Lien was improper.

116. Defendants have steadfastly refused to release the Lien and has made numerous attempts to get all or part of the claimed $122,474.07.

117. Supportkidstook steps and efforts to interfere with the Renos' ability to sell their home, to obtain financing, and to damage their reputation amongst mortgage lenders.

118. On June 13, 2000, Defendants CSE and Supportkids, through Enforcement Specialist Alice Black, contacted by facsimile Northland Mortgage and its employee Michelle McGuire, informing them of the Lien in an effort to interfere with the Reno's attempt to obtain financing and as a part of their effort to extort and defraud them of $122,474.07.

119. Supportkids, contacted Michelle McGuire of Northland Mortgage in June of 2001 and threatened to put a foreclosure sign on the Reno's home and to foreclose so as to wipe out a potential mortgage holder's Lien if Northland Morgage provided the Renos with financing.

120. Supportkids, made numerous calls to Northland

Mortgage in which CSE and Suportkids made various threats Northland Mortgage or anyone giving the Reno's financing in June of 2000.

121. Supportkids benefited by sabotaging the Renos attempts to sell their home because they would have no choice but to sell the home only under circumstances wherein Supportkids payoff amount of $122,474.07 would be locked in and a material condition of any financing or closing.

121. Supportkids also repeatedly pulled the Reno's credit in an attempt to damage the Renos' credit rating score; the Renos were rejected for a home refinancing in November of 2001, by Mortgage Elite, Inc., a Minnesota mortgage company solely or substantially based on the Lien.

123. In sum, the Defendants, individually and collectively, have caused the Renos tremendous stress and aggravation due to their outrageous threats and demands.

124. Some time in 1999, Alex Black of Supportkids a/k/a Child Enforcement a/k/a Supportkids called Mr. Reno.

125. Alex Black identified herself as being from "Child Support Enforcement" which is also known as Supportkids.

126. Mr. Reno believed she was an official of the State of Louisiana or Texas because Child Support enforcement to him meant the government.

127. She demanded approximately $120,0000 and insisted that Reno send it to her immediately.

128. Reno replied, "I don't have that kind of money in the bank," and Supportkids then said, "Well, since you are self-employed, you should have the money."

129. Reno then explained, "You know that I don't own a corporation or nothing. I could lose my job today."

130. Reno explicitly told Supportkids that his daughter had been adopted by her mother's former husband and that there was no way he still owed such a large amount.

131. Supportkids stated they would look into the issues raised by Mr. Reno, namely the effect of the adoption to see if the past child support payments were valid debts.

132. Supportkids called the Reno's home many, many times – sometimes as often as two to three times a day.

133. Supportkids, which call themselves "Child Support Enforcement," represented that they were a government agency of the State of Texas.

134. At some point, Ms. Reno, because she believed Child Support Enforcement to be an official agency of the State of Texas, called the Texas Attorney General Office to inquire if it had any record of Mr. Reno owing back child support; the person to whom she spoke said they had no record of any child support owing.

135. The state official told Ms. Reno that they [Supportkids a/k/a Child Enforcement] were not a state agency.

136. Ms. Reno was asked whether the Texas official was familiar with the name, she replied, "Oh, yeah, *quite familiar*."

137. From the first conversation, Supportkids issued a barrage of threats.

138. Supportkids threatened to put Reno in jail and to cause him to lose his driver's license if he did not pay them the whole lump sum ($120,000) "right away."

139. After getting off the phone with Supportkids, Mr. Reno did not know what to do so he called his wife, Kim Reno and told her about Supportkids $120,000 demand.

140. Mr. Reno repeated the phone conversation with Supportkids.

141. Mrs. Reno, upon hearing Supportkids' threats, was very upset at the thought of her husband going to jail and losing his driver's license. Without his license, Mr. Reno could no longer work as a dry wall installer

142. After that, Kim Reno, took all the calls. Because Mr. Reno worked long hours as a dry wall installer, he was rarely home during the day, working from 6:00 a.m to 8:00 p.m .

143. Over the next several years, Mrs. Reno bore the brunt of Supportkids'

constant phone calls and threats.

144. Most Supportkids contacts with the Renos were through Alice Black. Supportkids refused Mrs. Reno's request that they stop calling.

145. Typically, Mrs. Reno would discuss the calls with Mr. Reno after he came home from work. Supportkids, during phone conversations with Mrs. Reno, would state the following

146. Supportkids would represent that the Renos] owed about $122,000 and if they are not paid, Supportkids would take the house; Supportkids improperly used compound interest to calculate the alleged amount owed and they used a higher interest rated than provided by Louisiana law; also under Louisiana law, interest was unavailable without a specific court order and there was no such order.

147. Supportkids would spew a litany of vitriolic threats and abuse.

148. The Renos told her [Alex Black of Supportkids] to back off and she refused to back off.

149. For example Supportkids would threaten to charge Mr. Reno with a felony, threatening to take his license.

150. Ms. Reno stated that they have a minor that she needed to think about too, and Supportkids pretty much didn't care. He owed this money and he needed to pay it.

151. Mrs. Reno told Supportkids that the child for whom the child support payments were due had been adopted by Falcon's new husband.

152. Supportkids represented to Mrs. Reno that they would look into the issues she raised, namely the effect of the adoption, and check to see if the child support payments were owed.

153. Supportkids, as a matter of policy, investigates objections by alleged child support obligors.

154. Of course, when Supportkids initially takes a case, it reviews the non-

custodial parent's application and it checks for statute of limitations issues as well as conducts a review of pertinent court documents.

155. Supportkids, prior to filing the Lien, reviewed Louisiana and Minnesota law in conjunction with Sonia Falcon's claims against Mr. Reno regarding judgments in relation to their ability and legality of collecting back support from Mr. Reno.

156. Supportkids notes indicated that they were concerned because Ms. Falcon had not produced any court order or judgment that was under 10 years old and that Supportkids knew of Mr. Reno's inability to read.

157. Although lacking proper order or judgment, Supportkids decided to keep the Lien in place so it would have to be paid off before being sold or before a refinance could occur.

158. Many of the phone calls with Supportkids got to be quite animated because Supportkids just kept hounding over the same points over and over.

159. Mrs. Reno told Supportkids that the Renos went to Louisiana and they obtained information that Mr. Reno did not owe any child support according to state records.

160. Supportkids just ignored Mrs. Reno's statements.

161. Supportkids deliberately disregarded the Renos' rights by knowingly failing to investigate their objections and/or willfully going forward with the knowledge of the adoption, the statute of limitations.

162. Supportkids has admitted and recognized that the statute of limitation and adoption can affect the amount of child support owed as well as their ability to collect back child support.

163. Eventually Ms. Reno called the State of Minnesota to inquire about Supportkids and whether it could file a lien like that and they found it amusing because it was so hard to believe that any one who do anything so outrageous.

164. After they bought their home, the Renos did a refinancing through a

mortgage broker named Michelle McGuire to remodel their kitchen. Subsequently, in 2000, they went back to her to refinance at a lower interest rate.

165. Supportkids, probably by illegally examining their credit report discovered that the Renos' owned a home in Anoka County.

166. Supportkids then took steps to file a lien on the Reno's homestead.

167. At the time the Renos' financing went through, the lien ($122,474.07) apparently had just been filed on their home, but it did not yet show up on the Renos' title records.

168. At the time, there was no lien "on paper" at Anoka County.

169. Sometime in 2000, the lien did show up on the Anoka County Property records and from that point on, the Renos could not get any financing to rebuild their garage and to complete the extensive remodeling that their old house needed.

170. The amount of the lien was outrageously high, over $122,000. Supportkids has admitted that they filed the lien , in the amount of $122,474.07 on the Renos' homestead on April 25, 2000, in Anoka County (document number 1497198)(the "Lien").

171. At the time the Lien was filed, however, neither Supportkids or Sonia Falcon had commenced any proceedings in a Minnesota Court relating to the Lien or their child support claim.

172. After the Lien was filed and in the Anoka County Records, the Renos were denied credit on numerous occasions. For example, in the fall of 2001, Northland Mortgage, as set forth in a letter dated November 2, 2001, refused to provided them financing because of the Lien; the mortgage company mistakenly assumed that Child Support Enforcement was a state agency.

173. Supportkids denied that it was negligent in placing the Lien; if follows that the filing of the Lien and the over $122,000 amount
claimed, under the circumstances, was knowing, intentional, and/or willful.

174. Supportkids had knowledge of the Renos' objections, the adoption,

and the statute of limitations.

175. Supportkids has claimed that it obtained a Minnesota court judgment of Court order that authorized their Lien; yet, the facts show this statement is incorrect.

176. Supportkids has not identified and produced any such court order or judgment and no such judgment or order appears on the public record with the Anoka County Recorder's Office.

177. Supportkids even threatened and harassed the Renos' mortgage lender; Supportkids was calling the lender and actually threatening them to the point that she had to have her calls screened because she was harassing her so much.

178. Supportkids admits that on or about June 13, 2000, Alice Black contacted Michelle McGuire of Northland Mortgage by phone and fax and informed her of the filing of a Lien.

179. Eventually Ms. Reno called the State of Minnesota to inquire about Supportkids and whether they could file a lien like that. Minnesota officials were stunned at what Supportkids had done to the point where it was hard to believe they were doing what they were doing.

180. During the existence of the Lien–between 2000 and 2003, the Renos lived and continue to live in terrible conditions as they were unable to remodel their home and large areas of their house were under construction and unfinished, thus significantly interfering wither their use and quiet enjoyment of their home.

181. Due to the embarrassment of the unfinished home, the Renos avoided having friends and relatives over to their home.

182. The stress from the constant telephone calls and the threat of losing her home and of her husband going to prison took a tremendous emotional toll on Ms. Reno; Ms. Reno suffered a tragic miscarriage and the Renos lost their second child because of the stress.

183. On April 26, 2001, Mr. Reno caused a letter to be sent to Supportkids

warning them that their lien violated both state and federal law.

184. Supportkids, although knowing of the Liens' fraudulent and illegal nature, continued to willfully refused to release the lien in question from more than three years until August of 2003.

185.Defendants, in filing and attempting to enforce the Lien, failed to follow the requirements of Minn. Stat. § 548.091 (Uniform Family Support Act).

186. Defendants illegally filed the Lien in violation of Minn. Stat. § 548.091 because the judgment in question was more than ten years old, the Lien was not filed or docketed with the Tenth Judicial District Court Administrator, and Mr. Reno was not served with the Lien filings.

187. Supportkids, by failing to comply with Minnesota law, violated 42 U.S.C. § 666(a)(4) as such statute and regulation promulgated thereunder require parties seeking back child support to follow state and local procedures regarding the filing of liens and collections.

188. The official forms promulgated by the Secretary of Health and Human Services echo the federal government's comity and respect for each state's substantive and procedural framework for the enforcement of child support obligations.

189. The Instructions for Notice of Lien (one of the forms promulgated by the Secretary of Health and Human Services) provides that the laws and procedures of the state where the property is located or recorded determine which office or entity in that State is the appropriate one to receive the lien for filing; it is the responsibility of the agency office or private attorney issuing the lien to file it with the appropriate entity.

190. Defendants, in filing and attempting to enforce the Lien, also failed to follow the requirements of Minn. Stat. § 518C *et seq*. (Uniform Interstate Family Support Act).

191. Defendants, in filing and attempting to enforce the Lien, further failed to follow the requirements of Minn. Stat. §§ 547.26-33-548.091 (Uniform Enforcement of Foreign Judgments Act).

192. Supportkids belatedly released the Lien in August of 2003, around the

time the Renos moved to amend their Complaint to seek punitive damages.

**COUNT I**

(Slander of Title)

193. Plaintiffs restate and reallege the allegations set forth in ¶¶ 1-192 above as though fully set forth herein and further state and allege as follows:

194. Defendants published false statements concerning the Renos' real property related to the purported debt owed by Mr. Reno and the Lien.

195. Defendants had no colorable claim or right to cause said Lien to be placed on the Renos' property; Defendants knew that its Lien was completely improper and had no legal basis whatsoever and the lien was filed maliciously; the Lien, even if valid was improper as it put a cloud on the Renos' homestead in violation of Minnesota's homestead law Minn. Stat. § 510.01, as well as adversely affecting Mrs. Reno's joint tenency interest.

197. Such false statements include but are not limited, the Lien placed by Defendants on all property of Mr. Reno in Anoka, County Minnesota on April 25, 2000, at 5:00 p.m. at the Office of the Anoka County Recorder Document No. 1497198 located in the City of Anoka, Anoka County, in the State of Minnesota.

198. Defendants also published statements to various of the Renos' prospective lenders, including but not limited to Michelle McGuire of Northland Mortgage, Mortgage Elite, Inc., the Anoka County Recorder's Office, certain members of the Renos' extended family, and upon information and belief, possible unknown third parties.

199. Said statements were published maliciously.

200. The publication of such false statements concerning title to the Renos' Anoka home directly and proximately caused the Reno's pecuniary loss, including but not limited to, special damages which include attorneys fees.

201. In fact, Supportkids actually contacted mortgage lenders to put them on specific notice of the Lien in order to prevent the Renos from obtaining financing.

202. The Renos had to pay higher interest rates because they could not refinance their home due to the Lien; also, they incurred late fees on their mortgage on an on going basis because they could no refinance.

203. The Renos had to keep some of their possession in a rented storage facility because they could not use their garage and they incurred significant costs.

204. Mr. Reno was unable to operate his small business refurbishing vehicles because they could not get the financing to rebuild their garage and he therefore lost significant income. The Renos due to their inability to refinance, could not repair their home's foundation and during the time the Lien was filed the cost of repairing the foundation went up considerably because the problems grew worse and more difficult to remedy.

205. The Renos were unable to abate black mold in their basement due to lack of funds that they could have received in a refinance.

206. The Renos suffered greatly because of the mold and due to the fact that they could not use their basement.

207. As a result of the foregoing, Defendants seek damages, including special damages, including but not limited to attorney's fees, to be determined at trial.

**COUNT II**

(Defamation and Defamation *Per Se*)

209. Plaintiffs restate and reallege the allegations set forth in ¶¶ 1-208 above as though fully set forth herein and further state and allege as follows:

210. Defendants, on numerous occasions between 1999 and 2000, knowingly and intentionally published defamatory statements (both slander and libel), regarding Mr. Reno to Mrs. Reno and mortgage officers and other unknown third parties.

211. Defendants stated that Mr. Reno was: a dead beat, dishonest and disreputable person and a criminal based on his failure to pay the purported $122, 474.07.

212. Said defamatory statements are defamatory in general and are specifically

defamatory per se.

213. Said statements were published to Mrs. Reno, mortgage lenders and upon information and belief, other third parties whose true identities are unknown.

214. By placing a Lien on Mr. Reno's property, Defendants published to the world that Mr. Reno was a serious deadbeat and was failing to live up to his obligations as a father and his failure to follow court orders.

215. Said statements where known by Defendants to be false.

216. Defendants severely hampered Mr. Reno's ability to obtain credit because of Defendants' defamatory statements, both written and oral, as well as false reports to credit reporting agencies; the Renos also suffered the same types of damage as set forth with more particularity in Count I above based upon Defendants' defamation.

217. Defendants statements became known to Mr. Reno's extended family in Louisiana which caused both him and his wife extreme agitation, anxiety, and severe emotional distress.

218. Most if not all of the defamatory statements alleged herein are defamatory per se under Minnesota law.

219. As a direct and proximate cause, thereof, Defendants have been damaged, including but not limited to special damages, in an amount to be determined at trial.

220. Plaintiffs seek punitive damages under Minnesota law against Defendant Supportkids, Inc.

**COUNT III**
(Punitive Damages)

221. Plaintiffs restate and reallege the allegations set forth in ¶¶ 1-220 above as though fully set forth herein and further state and allege as follows

222. Based upon the allegations alleged herein, Supportkids had knowledge of facts, or alternately, Supportkids intentionally disregard facts, that created a high probability of injury to the rights or safety of the Renos and their property.

223. Supportkids, based upon the allegations alleged herein, deliberately proceeded to act in a conscious or intentional disregard of the high probability of injury to the rights or safety of the Renos and their property, or alternatively, Supportkids deliberately proceeded to act with indifference to the high probability of injury to the Renos' rights and property.

224. Accordingly, the Renos seek punitive damages for the conduct alleged herein as to Counts I and II of the Amended Complaint for the purposes of punishing and deterring Supportkids.

**WHEREFORE**, Plaintiffs, Anthony C. Reno and Kimberly Reno, pray for judgment against, Defendants, Supportkids, Inc., a Texas corporation; Child Support Enforcement, Inc., a Texas corporation; and Richard C. Fry, individually and jointly and severally, as follows:

1. That Defendants are liable to Plaintiffs, individually and jointly and severally, for compensatory, consequential, and special damages to the maximum extent provided by law, in an amount, excluding costs and disbursements, in excess of $75,000.00;

2. That Defendants are liable, individually and jointly and severally, to reimburse Plaintiff for all of their costs and disbursement, including attorney's fees;

3. That the Court issue an order directing that the Defendants and their employees, agents, attorneys, representatives and affiliates, be enjoined from attempting to collect any debt or alleged debt and from seizing any property of Plaintiffs by judicial process or otherwise;

4. That the Court issue an order preventing Defendants, from defaming Plaintiffs or interfering with their contractual and business relationships with third-parties, that they take immediate steps and measures to remove any negative credit information related to Defendants' claims from Plaintiffs' credit report;

5. Plaintiffs seek punitive damages against Defendant, Supportkids, Inc., a Texas corporation;

6. Such other and further relief as the Court deems just and equitable; and

7. Plaintiffs demand a trial by jury for all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Seventh Amendment of the U.S. Constitution, and as otherwise provided by law.

Respectfully submitted,

**THE OLIVER GROUP, PLC**

Dated: **17 September 2004**

/e/ Karl A. Oliver________________

Karl A. Oliver, Esq., # 0269853
1935 W. County Road B2, Suite 415
Saint Paul, Minnesota 55113
Telephone: 651-636-7960

**ATTORNEYS FOR ANTHONY C. RENO AND KIMBERLY RENO**